## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **AUDREY M. LEVESQUE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:15-CV-1272-VEH** |
| | ) | |
| **OKTAN TRANSPORT, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is a civil action filed by the Plaintiff, Audrey Levesque, against the

Defendant, Oktan Transport, Inc. ("Oktan"). (Doc. 1). The Complaint sets out counts

for: negligence (Count One); wantonness (Count Two); negligent and wanton

entrustment (Count Three); and negligent hiring, training & supervision (Count Four).

All counts arise out of an automobile accident between the Plaintiff and  Ramunas

Blazys, who was driving on behalf of Oktan.[1]

The case comes before the Court on the Plaintiff's Motion for Summary

Judgment against Oktan. (Doc. 35). As stated in the Motion, the Plaintiff moves for

judgment on the negligence claim alone, and "[s]pecifically . . . requests this Court

---

[1] The Complaint also names Blazys as a Defendant.  The Plaintiff voluntarily dismissed
Blazys on November 30, 2015.  (Docs. 10, 12).

enter summary judgment in her favor as to the elements of duty, breach, causation, and the existence of damages (not the amount of damages).") (Doc. 35 at 1). The Plaintiff "also requests summary judgment in her favor as to the affirmative defense of contributory negligence." (Doc. 35 at 1).

## I. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 2265 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once the moving party has met its burden, Rule 56(c) requires the

non-moving party to go beyond the pleadings in answering the movant.[2] *Id.* at 324, 106 S. Ct. at 2553. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d. 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249, 106 S. Ct. at 2511.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City*

---

[2] When *Celotex* was decided FED. R. CIV. P. 56(e) encompassed this express requirement, but now this concept is covered by the language provided for under FED. R. CIV. P. 56(c).

*of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183, 135 L. Ed. 2d 606 (1996). The second method a movant in this position may use to discharge its burden is to provide

affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.    FACTS[3]

### A.    The Accident

On March 4, 2014, Levesque was the driver/operator of a Greyhound bus and was returning to Birmingham, Alabama after driving to Atlanta. She was driving her bus along Interstate 20 when she was involved in an accident with an eighteen wheeler driven by Blazys, on behalf of Oktan.[4] The Plaintiff testified in her deposition as follows:

---

[3] The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included herein exactly as it was proffered, without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

[4] The Defendant agrees that Blazys was operating the truck "under the authority and dispatch of Oktan." (Doc 39 at 3).

Q. This truck that was involved in the accident with you, do you ever recall seeing that truck on the road prior to the accident?

A. Yes.

Q. Tell me about that, please.

A. He was behind me driving [erratically][5]. And I felt -- I came around and I passed him and went on down the road. He was crossing the line like in and out.

(Doc. 36-2 at 19(72)). The Plaintiff also testified that the bus she was driving had a speed governor on it which prevented the bus from exceeding 70 miles per hour. (Doc. 36-2 at 12(41)). The testimony continues:

Q. You were traveling faster than he was when you passed him?

A. Yes, sir. I had to pass him.

Q. But you couldn't have gone more than seventy to pass him, right?

A. That's right.

Q. Why did you pass him?

A. Because he was going in and out of the lane, crossing the line, coming -- I felt unsafe.

Q. After you passed him, do you recall seeing him?

A. No.

---

[5] The Plaintiff actually stated the truck was driving "sporadically." Based on the context, the Court concludes that she meant "erratically."

(Doc. 36-2 at 20(73)).

It is undisputed that, after the Plaintiff passed Blazys, the vehicle Blazys was driving rear-ended the Plaintiff's bus. The Plaintiff testified that, at that time, she was traveling around sixty or sixty-two miles per hour, and that immediately upon impact, the bus died and she "had no control . . . had to steer it with no power," so she applied the brakes and then coasted to the side of the road. (Doc. 36-2 at 16(58); doc. 36-2 at 14(52); doc. 36-2 at 15(55)). The Plaintiff never left her lane until she pulled off on the side of the road. (Doc. 36-2 at 16(57)).

Levesque remained with the bus until it was towed. In the meantime, the bus passengers were taken to a nearby high school gymnasium by a separate Greyhound bus, which then returned to the accident scene for the Plaintiff. The Plaintiff did not experience any pain at the time of the accident or during the time she was waiting for the second bus. As Levesque was attempting to enter the bus, her legs went numb and she was unable to enter the bus without assistance. The Plaintiff was transported via ambulance from the Greyhound bus office in Birmingham, Alabama to the St. Vincent's Hospital Emergency Room.

## B.    The Plaintiff's Medical Treatment

The Plaintiff told an emergency room doctor at St. Vincent's that she was "having pains in [her] legs." (Doc. 36-2 at 24(91)). At that time, she was having no

pain in any other areas. (*Id.*) Hospital records reflect that she complained of "bilateral leg cramps and right wrist pain." (Doc. 41-2 at 18). The doctors at St. Vincent's "gave [her] some pain medication and sent [her] home." (Doc. 36-2 at 24(91)).

The Plaintiff continued to have symptoms after she left the ER. She testified that "It got really bad. After I went home and laid down, my arms started hurting, the numbness, it was horrible. I couldn't move. Everything was hurting, my back, my neck, my arms, my legs." (Doc. 36-2 at 25(93)). Thereafter, the Plaintiff received treatment from Dr. Chauncey Thuss. (Doc. 36-2 at 25(96)). The Court file contains no records or testimony from Dr. Thuss. However, the Plaintiff was later treated by Dr. Jeffrey Todd Smith, who summarized her history as follows:

> She said she was referred to Dr. Thuss. She was started on physical therapy with Dr. Thuss. At the time she saw Dr. Thuss she told him she has some pain in the right hand and numbness and tingling in the left hand. She said she went to physical therapy for her low back. She did this for about 2 to 3 weeks. She did not get any better. It actually made her neck start hurting. She started getting worse. She states she is still having numbness in the left hand. She has some pain in the right hand. She denies any balance issues. She bas had an MRI of cervical spine now and was sent here for evaluation.

(Doc. 41-2 at 7).[6]

---

[6] The Plaintiff does not object to the admissibility of this record, or the statements therein. She does, however, "disagree[] that Dr. Thuss 'provided' her with physical therapy." (Doc. 44 at 2). The Court treats this "disagreement" as a "dispute" of the fact offered by the Defendant, and notes that the Plaintiff provides no citation to the record in support of her dispute. This court's Uniform Initial Order, entered in this case on August 4, 2015, provides:

Dr. Smith began treating the Plaintiff in April of 2014. His records include a New Patient Medical History Form. This form included questions for Levesque to answer. (Doc. 41-2 at 12). Question number 2 asks "[i]s your problem the result of an injury or accident?" The choices are "No injury" "Injury" "Injury at Work" "Auto Accident" "Sport Injury" "Prior Surgery." "Injury" was selected. (*Id.*). The form also includes the question: "[h]ow long have the symptoms been present? (ex. 2 months)." (*Id.*). The handwritten response is "2 yrs." (*Id.*). The form is undated. In his deposition, Dr. Smith testified that this form would have been completed by the Plaintiff after Dr. Smith's office converted to electronic records, not on her first visit with him. (Doc. 36-3 at 22(81-82)).

Dr. Smith's records also include diagnostic testing on the Plaintiff that was performed and interpreted by two independent radiologists. A cervical MRI done on April 7, 2014, related "[m]ultilevel degenerative disc and facet disease with neuro-foraminal stenosis as detailed above and mild spinal canal stenosis." (Doc. 41-2 at 23). Regarding this report, the following exchange took place in Dr. Smith's

---

Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based. *All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*

(Doc. 4 at 19) (italics in original). The fact is deemed admitted.

deposition:

Q. What is degenerative changes and facet disease?

A. That is a disk that is worn. In other words, it would relate to age-related changes. The disk and associated facet joints are the joint in the back of the spine.

Q. And foraminal stenosis, what is that?

A. The foramen is the area where the nerve exits from the spine.

Q. What does stenosis mean?

A. Stenosis is narrowing of the canal from which something travels or exits out, such as you can get your pipes rusted in a house and you can get poor flow from that in an older house, so those stenotic pipes.

Q. In her instance would that be a result of the degenerative disk and facet disease?

A. You know, I reviewed the MRI, and I did think she had, as noted in my report regarding I think she had degenerative changes in her neck as stated here when I said cervical spondylosis at C4-5, CS-6, and C6-7 levels, I do think she had disk protrusions at CS-6 and C6-7 on the left with foraminal stenosis and some degree of disk osteophyte complex to the right at C4-5, CS-6 and C6-7. Of course disk osteophyte would be more of a chronic issue. So I think it was a combination of some chronic and acute findings.

Q. Okay. I don't see any acute findings that were identified by the radiologist who first read the films.

* * *

A. I don't see where he mentions acute or non-acute. It's not really the purvey [sic] of the radiologist to determine acuity of issues, and again, we

10

don't treat MRIs. We treat the individual. So in that regard I also made my review and this is not the MRI. This is the MRI report, so it is not the gold standard from which to go. When I'm driving a car, I don't close my eyes and have the passenger tell me where to turn, I have my eyes open. So any time I'm doing a procedure or treating someone, I look at the studies myself.

(Doc. 36-3 at 17(62-74)).

The findings from a July 24, 2014, Post-Mylogram CT Cervical Spine included the following: at C4-5 a "mild chronic right-sided disc protrusion," at C5-6, "a broad chronic-appearing largely osteophytic central and right-sided disc protrusion," at C6-7, "a left uncinate disc osteophyte complex" and at C-7-T1, "facet joint hypertrophic degenerative change." (Doc. 41-2 at 9). Referencing this report, Dr. Smith testified:

Q. Would you agree that chronic in medical terminology means developing over time?

A. Chronic means that it's been there. Now it doesn't necessarily speak development of time. It could have developed a long time ago and not changed.

(Doc. 36-3 at 19(69)). Dr. Smith agreed that the Plaintiff has osteophytes, and stated that "osteophytes are chronic, but you can have osteophytes and a disk herniation. Just because you developed degenerative changes does not make you invincible. As a matter of fact, it does the other way." (Doc. 36-3 at 19(70)). He continued:

I certainly agree she had prior issues. She did have spondylitic changes that were chronic. I do believe she had osteophytes that were chronic. I do believe that she had an acute onset of symptoms, unless there's

11

information to tell me otherwise, associated with the accident. And I do believe that she had the symptoms for which we were treating or not treating an MRI or a CT myelogram, especially with the accident. I do believe very likely she had disk herniations or disk protrusions that worsened, even though she may have already had disk osteophyte complexes associated with the accident, and I do think secondary to the fact she had preexisting degenerative changes and spondylitic changes it made her more susceptible to injuries, such as a chest skull[7] theory in your terminology, not to venture into your realm.

(Doc. 36-3 at 19(71-72)). On August 25, 2014, Dr. Smith performed neck and low

back surgery on the Plaintiff. Dr. Smith testified:

Q. In your opinion to a reasonable degree of medical certainty is it the wreck that caused the injuries that you were treating [the Plaintiff] for?

A. I do believe that I was treating her for her myelopathy and her radiculopathy, and I do believe that more likely than not the motor vehicle accident led to the symptoms that led to the surgery.

(Doc. 36-3 at 11(37).

In patient notes dated February 23, 2016, Dr. Smith wrote:

She has pain in her back and lower extremities. She did have surgery on her lumbar spine by Dr. Savage. Patient states that this was done under her regular insurance. I had previously seen her with some complaints of back issues but at that point it was determined it was non-work related condition secondary to the fact that even though she had some initial complaints with this, it had [sic] many, many months since the time of her injury and complaints and she started complaining to me again of some back issues. There is a long delay. She states this occurred as a recurrence

---

[7] Dr. Smith likely meant to say "egg shell" here, as in the theory that the preexisting condition or frailty of the injured person is not a valid defense to the seriousness of and injury caused to them.

12

back in January, 2015. She was also evaluated at that time for some hand numbness. She was sent for EMG/nerve conduction studies. She was found to have bilateral carpal tunnel syndrome that was severe, therefore, it was determined she had non-worked work related carpal tunnel syndrome, symptomatic on the right. . .

Plan: I do think further care or evaluation for her carpal tunnel syndrome should be done under her regular insurance. I do think further care for her lumbar spine should be treated under her regular insurance. . .

(Doc. 41-2 at 11).

## III. ANALYSIS

The Plaintiff argues that, as to Count One, she is entitled to summary judgment in her favor "as to the elements of duty and breach of said duty." (Doc. 35 at 10). She asks this Court to hold that: 1) the Defendant owed the Plaintiff a duty to exercise due care and to keep a lookout for Plaintiff while Plaintiff used the road; and 2) the Defendant breached such duty owed to Plaintiff. (Doc. 35 at 9). The Defendant admits that it has no factual basis to challenge the elements of duty and breach in this case. (*See* doc. 39 at 2). Accordingly, summary judgment will be granted in favor of the Plaintiff and against the Defendants on this issues. Based on this holding, summary judgment is also appropriate in favor of the Plaintiff and against the Defendant on the defense of contributory negligence.[8]

---

[8] Even if the Defendant had not conceded the elements of duty and breach, summary judgment against the Defendant on the issue of contributory negligence would be appropriate because the Defendant makes no argument on that issue. *See, Lafarge N. Am., Inc. v. Nord*, 86

After careful review of the evidence of causation and damages, and the parties' arguments regarding same, the Court holds that the Plaintiff has not shown that there is no genuine issue of material fact as to causation and damages. Summary judgment will be denied on these issues.

## IV.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED, ADJUDGED**, and **DECREED** as follows:

1.   Summary Judgment is hereby **GRANTED** in favor of the Plaintiff, and against the Defendant, Oktan, on the issue, in Count One, of whether the Defendant had a duty to the Plaintiff, and whether the Defendant breached that duty. The Court **HOLDS** that, as to Count One: 1) the Defendant owed the Plaintiff a duty to exercise due care and to keep a lookout for the Plaintiff while the Plaintiff used the road; and 2) the Defendant breached such duty owed to the Plaintiff.

2.   Summary judgment is hereby granted in favor of the Plaintiff and against the Defendant on the issue of whether the Plaintiff was contributorily negligent. The court **HOLDS** that, as a matter of law, the plaintiff was not.

---

So. 3d 326, 336 (Ala. 2011) ("Contributory negligence is an affirmative defense that the defendant bears the burden of proving.").

3.    In all other respects, summary judgment is **DENIED**.

The case will be set for a pretrial conference in a later order.

**DONE** and **ORDERED** this 6th day of February, 2018.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge